# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>) | No. 3:07-cr-00209 |
| v. )<br>) | Judge Haynes |
| )<br>MONTERREAL FIELDS ) | |

## MEMORANDUM

The Defendant in this action is charged with possession with intent to distribute 500 grams or more of cocaine. Defendant was arrested on October 31, 2007, on charges of possession with intent to distribute 500 grams or more of cocaine. On November 2, 2008, after a hearing, the Magistrate Judge issued an order detaining Defendant pending trial. A trial was scheduled in this case for January 15, 2008, but on January 7, 2008, Defendant filed a motion to continue the trial with a waiver of his speedy trial rights. (Docket Entry Nos. 20, 21). In his waiver, Defendant signed the following provision: "I hereby consent to having my case continued for trial until a later date, and in so doing waive any rights I may have under the Speedy Trial Act . . . [.]" (Docket Entry No. 21). Defendant did not waive a specific period of time. Id.

On January 31, 2008, Defendant filed a motion to suppress (Docket Entry No. 24) to which the government responded. (Docket Entry No. 25). On February 25, 2008, an evidentiary hearing was held on the Defendant's motion to suppress. (Docket Entry No. 26). Counsel were given three weeks to submit proposed findings of fact and conclusions of law. (Docket Entry No. 26). On March 17, 2008, Defendant filed proposed findings of fact and conclusions of law. (Docket Entry No. 30). On April 7, 2008, the Court denied Defendant's motion to suppress and scheduled a jury trial for May 6, 2008. (Docket Entry No. 31).

On April 14, 2008, Defendant moved to reconsider the denial of the motion to suppress. (Docket Entry No. 14). On April 30, 2008, the Court granted the motion to reconsider and continued the trial pending a new ruling on Defendant's motion to suppress. (Docket Entry No. 33). On May 23, 2008, the government filed proposed findings of fact and conclusions of law. (Docket Entry No. 34). On August 7, 2008, Defendant filed a supplemental memorandum on the suppression issue, citing recent Sixth Circuit decision since the earlier suppression hearing. (Docket Entry No. 35).

## A. FINDINGS OF FACT

On the morning of October 30, 2007, Shawn Applegate, a Sergeant with the Rutherford County Sheriff's Office observed westbound traffic while in his unmarked patrol vehicle on the median of Interstate 24, at the 91 mile marker. At approximately 11:10 a.m., Sergeant Applegate saw a 2007 Grand Prix suddenly decrease its speed, causing the front end of the car to drop dramatically, reflecting a sudden breaking. The vehicle was traveling at approximately 65 miles per hour and was not violating the speed limit. Applegate noticed that the driver appeared "real rigid" with his arms locked in the "ten and two" position on the steering wheel. The driver of the vehicle would not turn and look out his side window.

Applegate decided to follow this vehicle to observe further its occupants' behavior. Applegate could see the driver looking at him in the rear view mirror and exited the Interstate at the 89 mile marker. Once the vehicle moved past the exit, Applegate reentered the Interstate to travel behind the vehicle to observe further. As Applegate approached the vehicle from behind and from the far left lane, the Defendant's vehicle that was in the far right, following a semi-truck too closely. Applegate then turned on his video recorder and counted "one thousand and one," and after Applegate counted "one thousand and one," the Defendant crossed over the fixed mile

2

marker reflective that the vehicle was within an approximate one-second—or approximately twenty feet—distance from the semi truck. The Defendant's vehicle maintained a one-second distance behind the semitruck for several seconds, as reflected on Applegate's video. Government's Exhibit 1 (hereinafter "Video"). Applegate then stopped the vehicle at the 87 mile marker on Interstate 24 for the traffic violation of following another vehicle too closely because the Defendant's vehicle was traveling only one car length behind a semi-truck.

Applegate approached the vehicle and informed the driver, the Defendant Fields that he was following a semi-truck too closely and that he needed to drive at least five car lengths behind another vehicle. In the video, Sergeant Applegate told the driver, "You were on the tail of that tractor trailer, and you need to give yourself at least 5 car lanes." The Defendant responded, "all right." Applegate then asked for his driver's license and registration. Another passenger was in the vehicle and Applegate detected an overwhelming odor of air freshener inside the vehicle. Applegate observed the driver breathing heavily and licking his lips.

The Defendant informed Applegate that his vehicle was a rental car and produced a rental contract from Enterprise Rent-A-Car in Evansville, Indiana. The rental contract reflected that Melana Davis rented the vehicle on October 29, 2007, at 12:11 p.m., 23 hours prior to the traffic stop. Government Exhibit 2, rental contract. The rental contract did not list any other authorized driver. The Defendant initially told Applegate that his girlfriend rented the car and granted him permission to drive the vehicle.

Applegate knew that travel from Evansville, Indiana would take six and a half to seven and a half hours and 23 hours had passed since the car was rented. Defendant later stated that he had traveled to Atlanta, Georgia then back through Murfreesboro. Applegate deemed this a quick turn-around trip "unusual" and from his training and experience, Applegate knew illegal drug

3

offenders sometimes "don't want to be tied to a vehicle," and have another person rent the car so as not to disclose their names. Transcript at p. 31. In Applegate's experience, persons involved in illegal drug trafficking, secure a vehicle for a short length of time to complete their business and returned the vehicle.

After securing the rental contract, Applegate radioed for a backup officer and issued a "Code 4," a code for drugs, or weapons, or an unusual highway stop. Transcript at pp. 22, 42. Applegate considered the Defendant's apparent nervousness, and the short rental period of only 23 hours, suggested a quick turnaround trip. Applegate also observed: (1) the Defendant's unusually heavy breathing; (2) the heavy smell of air freshener in the vehicle that is often used to cover up the odor of narcotics; (3) that the rental contract did not list the Defendant as an authorized driver; and (4) that this vehicle had been rented only 23-hours prior in Indiana and traveled to Georgia and then to Murfreesboro.

After the dispatch, at approximately 11:13 a.m., Applegate returned to the vehicle and asked the Defendant to exit the vehicle so that Applegate could write the warning citation. The Defendant exited his vehicle and walked to Applegate's patrol unit. The Defendant then placed both hands on the patrol unit's push bumper for handcuffing.

While the Defendant was standing against the patrol unit, Applegate wrote a warning citation, but also asked the Defendant additional questions about the rental car and his travels. Transcript at p. 48. The Defendant responded that he was coming from Atlanta where the Defendant had been for "two days." Transcript at pp. 24, 43, 44, 47. Applegate considered this answer "impossible" because the rental contract reflected a rental in Evansville, Indiana approximately 23 hours prior. As to "what part of Atlanta," the Defendant responded "Uh, Decatur," explaining he helped move a friend from Kentucky to Atlanta. Transcript at p. 25.

4

Applegate then asked, "so are you telling me that a couple of days ago you got to Atlanta?" The Defendant responded, "yeah, we are just coming back."

Sergeant Applegate then asked the Defendant whether he had any weapons, currency over $10,000, alcohol, or pirated movies. The Defendant displayed additional signs of nervous behavior, such as scratching his throat, grabbing by his collar, licking his lips, shrugging his shoulders and breathing heavily. Applegate then asked when the Defendant had arrived in and left Atlanta to which Defendant responded, that he arrived in Atlanta the prior night. This answer differed from the Defendant's prior answer about his travel to Atlanta. The Defendant also stated that the girl who rented the vehicle was not his girlfriend, also contrary to his original explanation. Applegate asked the Defendant for consent to search the vehicle, and the Defendant refused consent. Tr. at 27.

Applegate then reapproached the vehicle and questioned the passenger who responded that he and the Defendant were coming from Atlanta and had arrived in Atlanta the night before. At approximately 11:17 a.m., Applegate called dispatch, and ran a license and warrants check on the Defendant, a standard procedure for a traffic stop. Awaiting a response, Applegate informed the Defendant that he would conduct a canine sweep of the car. At this point, Applegate considered that reasonable suspicion for a canine sweep of the vehicle existed citing: (1) the Defendant's nervousness, (2) the overwhelming scent of air freshener in the car, (3) that the Defendant was an unauthorized driver of the rental car; (4) the Defendant's contradictory statements about when the vehicle was rented and whether he had borrowed the vehicle from his girlfriend, (5) the quick turnaround of the Defendant's trip, and (6) the impossibility of renting the car two days ago, as the Defendant stated he had done.

At approximately 11:18 a.m.—eight minutes into the stop — Applegate conducted an

outside sweep of the car with his canine, named "Jett." Jett alerted to drugs at the front driver's side and front passenger's side doors of the Defendant's vehicle. Applegate placed Jett back in his patrol unit and searched the Defendant's vehicle, finding a kilogram-sized brick—wrapped in cellophane, newspaper, and masking tape—in a backpack located in the trunk of the vehicle. The kilogram-sized brick contained cocaine.

Immediately after finding the cocaine, at approximately 11:23 a.m., Applegate drew his gun and ordered the Defendant and the passenger onto the ground and arrested them. Applegate immediately Mirandized[1] the Defendant and the passenger. After stating their rights, Applegate asked the Defendant and the passenger, "Do you understand your rights?" Both responded "Okay."

## B. CONCLUSIONS OF LAW

An officer may stop a vehicle consistent with the Fourth Amendment when the officer has reasonable suspicion to believe that the motorist committed a criminal traffic violation. United States v. Sanford, 476 F.3d 391, 395 (6th Cir. 2007). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. Terry v. Ohio, 392 U.S. 1, 21 (1968). The legality of a traffic stop is not determined by an officer's subjective intentions. Whren v. United States, 517 U.S. 806, 813 (1996).

Under Tennessee law, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and the condition of the highway." TENN. CODE ANN. § 55-8-124(a). Violation

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

6

Case 3:07-cr-00209 Document 45 Filed 06/24/09 Page 6 of 10 PageID #: 273

of this law is a Class C misdemeanor. See id. The Tennessee driver's manual provides that vehicles should maintain at least one car length for every ten miles per hour. See Sanford, 476 F.3d at 395 (quoting United States v. Valdez, No. 02-5369, 147 Fed. Appx. 591, 594 (6th Cir. Sept. 26, 2005)). When following large vehicles—such as a truck or a bus—the Tennessee Driver's Manual recommends a following distance of at least three to four seconds. Government's Exhibit 4. The Sixth Circuit held that reasonable suspicion for a traffic stop arises where a law enforcement officer has objective reason to believe that a vehicle has violated the distance specified in the Tennessee driver's manual. United States v. Walton, No. 06-5297, 258 Fed. Appx. 753, 756-57 (6th Cir. 2007); Sanford, 476 F.3d at 395, Valdez, 147 Fed. Appx. at 594 (holding that police officer's observation of car following within twenty feet of car in front of it for fifteen seconds gave rise to probable cause justifying stop).

Here, based upon his undisputed testimony, Applegate had reasonable suspicion to believe that Defendant violated the two second rule. Applegate observed the Defendant following a tractor-trailer at a distance of one-second behind that truck. To determine this distance, Applegate conducted a "count," of "one thousand and one" and before Applegate could get to "one thousand two," "the Defendant's vehicle passed the same mile marker." Id. At the time of the stop, Applegate told the Defendant that at his speed of travel, he should be at least five car lengths behind the vehicle in front of him. Thus, the Defendant's traffic violation under Tennessee law gave reasonable suspicion and probable cause to stop the Defendant's vehicle. Sanford, 476 F.3d at 395.

Moreover, in the Sixth Circuit, a police officer may stop a motorist for any traffic violation, even if the officer's primary purpose is to investigate secondary crimes. United States v. Townsend, 305 F.3d 537, 541 (6th Cir. 2002).

As to the Defendant's contention of an improper investigatory stop, the officer must be articulate specific facts that criminal activity "may be afoot." See United States v. Sokolow, 490 U.S. 1, 7 (1989). The existence of reasonable suspicion must be viewed in the "totality of the circumstances." United States v. Erwin, 155 F.3d 818, 822 (6th Cir. 1998) (en banc). "A totality of the circumstances analysis prohibits [this Court] from discounting certain factors merely because, separately, they could potentially have 'an innocent explanation.'" United States v. Walton, 258 Fed. Appx. at 758 (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). When forming his reasonable suspicion, a law enforcement officer is "entitled to assess the circumstances and defendant's [sic] in light of his experience as a police officer and his knowledge of drug courier activity." United States v. Hill, 195 F.3d 258, 270 (6th Cir. 1999) (noting district court finding) (citations omitted).

Here, Applegate's reasonable suspicion of contraband in the Defendant's vehicle was based upon: (1) the Defendant's nervousness, (2) the overwhelming scent of air freshener in the car, (3) the fact the Defendant was an unauthorized driver of the rental car; (4) Defendant's contradictory statements about rental and whether his girlfriend rented the vehicle; (5) the quick sequence trip, and (6) the impossibility of renting the car two days ago.

In Hill, a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul were held to justify continued investigative detention. 195 F.3d at 270-73. In Walton, the court held that reasonable suspicion was established when officer observed a 1/4 inch stack of cash in the glove box, defendants and passenger provided conflicting explanations of their travel plans, and the passenger had no driver's license where the driver stated that they take turns driving. 258 Fed. Appx. At 758. In United States v. Ellis, reasonable suspicion was held to exist where an officer's inability to confirm an alias, discrepancies between the driver and the

8

passenger on the reasons for their trip, and discrepancies on how much money the passenger had paid for the trip constituted reasonable suspicion. 497 F.3d 606, 614 (6th Cir. 2007). See also United States v. Walker, 181 F.3d 774, 778 (6th Cir. 1999).

A lawful traffic stop "may become an impermissible 'seizure if it occurs over an unreasonable period of time or under unreasonable circumstances.'" United States v. Davis, 430 F.3d 345, 354 (6th Cir. 2005) (quoting United States v. Orsolini, 300 F.3d 724, 729-30 (6th Cir. 2002)). Here, the time between the initial stop and when Applegate completed the canine sweep of the Defendant's vehicle, was less than thirteen minutes. This has been held to be reasonable time for investigative detention. Ellis, 497 F.3d at 613-614 (holding as constitutionally permissible a traffic stop lasting twenty-two minutes from the time of the stop until the time of consent to search); Walton, 258 Fed. Appx. At 754-55, 758 (16-minute stop from time of stop until consent to search obtained held permissible).

Here, approximately eight of the thirteen minutes included Applegate's license and warrants check and writing the warning citation. During this time, Applegate was justified in asking the occupants general questions relating to the purpose of travel. Hill, 195 F.3d at 268. The next five minutes of the stop was for a canine sweep of the car. As stated earlier, Applegate had reasonable suspicion of criminal activity for this time period. As the Sixth Circuit stated, this court "must be mindful of the police officer's duty to conduct the stop with the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id. at 270. Applegate conducted an eight minute traffic stop and a five-minute detention, based on his reasonable suspicion that criminal activity was afoot. The Defendant was detained for a

constitutionally-permissible, brief period that does not violate the Fourth Amendment.[2]

For these reasons, the Defendant's motion to suppress (Docket Entry No. 24) should be denied.

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of June, 2009.

WILLIAM J. HAYNES, JR.
United States District Judge

---

[2] Because the Defendant has abandoned his original challenge to the canine's alert to the vehicle and his assertion that he was not Mirandized after his arrest, this Memorandum does not address those two issues. Nevertheless, both claims are meritless. The evidence shows that Jett—the canine who conducted the search—positively alerted to the vehicle. Tr. at 51. As such, Sergeant Applegate had probable cause to search the vehicle. See United States v. Diaz, 25 F.3d 392 (6th Cir. 1994). The evidence also shows that the Defendant was Mirandized immediately after his arrest and, indeed, verbally acknowledged that he understood his rights. Tr. at 51, 52, 54, 55; Video.